UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

FIRST MERCURY INSURANCE COMPANY,
an Illinois corporation

                 Plaintiff,                               Case No. 3:12-cv-02348-ST

           v.                                   OPINION AND ORDER

WATERSIDE CONDOMINIUM
ASSOCIATION, an Oregon non-profit
corporation; and MORRISON BUILDING
CORP., an Oregon corporation, dba
MORRISON CONSTRUCTION, INC. OF
OREGON

                 Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, First Mercury Insurance Company ("First Mercury"), filed this action against

defendants, Waterside Condominium Association ("Association") and Morrison Building

Corporation, dba Morrison Construction, Inc. of Oregon ("Morrison"), seeking a declaratory

judgment that it has no indemnity obligation under three insurance policies issued by First

Mercury to Morrison.

This court has diversity jurisdiction pursuant to 28 USC § 1332.  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #21).

First Mercury has filed a Motion for Summary Judgment (docket #36).  For the reasons set forth below, that motion is granted as to all three policies.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989).  The substantive law governing a claim or defense determines whether a fact is material.  *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000).  The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party."  *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011).

## UNDISPUTED FACTS

Around January 25, 2005, Morrison entered into an agreement with Hayden Island Condos, Inc. ("Hayden") to construct Waterside Condominiums, consisting of 84 units.  Green

Decl., Ex. 4, p. 3.  That contract was later amended to specify that Hayden had obtained

Comprehensive General Liability insurance coverage ("CGL") for the period from March 4,

2005, to June 4, 2006.  *Id*, pp. 3-5.  The CGL policy was placed with underwriters at

Lloyd's, London to cover ongoing operations, but did not cover completed operations

("Completed Ops Coverage").  *Id*, pp. 3-5.  In lieu of purchasing Completed Ops Coverage,

Hayden set aside $1,000,000 in an account ("Set Aside") "to pay potential Completed Ops

Coverage claims, suits or actions against, and attorney fees and costs incurred by, [Hayden],

Morrison and any subcontractor of Morrison approved by [Hayden] . . . arising out of or related

to the Project."  *Id*, p. 3.  The Set Aside covers "any amount that [Hayden, Morrison, or an

approved subcontractor] is legally obligated to pay to another person by way of settlement,

judgment, or award, including, but not limited to, any legally recoverable costs and attorney fees

related to any Set Aside Claims."  *Id*, p. 4.

Hayden turned over control of the Association to the individual unit owners on

October 13, 2010.  Thorpe Decl., Ex. 2, ¶ 8.  On March 16, 2012, the Association filed suit in

Multnomah County Circuit Court, alleging that Morrison and others were liable for faulty

workmanship in the construction of the Waterside Condominiums resulting in water intrusion

and extensive property damage.  *Id*, Ex. 2.  The faulty workmanship included "improper or

defective materials; improper design; or noncompliance with applicable building codes, industry

standards, or manufacturer specifications and guidelines" in the following general categories:

"Exterior Wall Assemblies," "Roof Assemblies," "Deck Assemblies," and "Miscellaneous."  *Id*,

¶ 18, pp. 7-15.

First Mercury issued three one-year commercial general liability policies to Morrison

beginning February 1, 2005, and ending February 1, 2008.  Green Decl., Exs. 6-7; Green Suppl.

Decl., Ex. 2.  Each policy contains an exclusion from coverage for certain residential

construction ("Specific Operations Exclusion"), but the language of that exclusion varies slightly

in each policy.  The 2006-07 and 2007-08 policies also exclude operations covered by a

"consolidated (wrap-up) insurance program" ("Wrap-up Exclusion").  Based on these exclusions,

First Mercury denied coverage to Morrison for the alleged property damage suffered by the

Association.

On June 18, 2012, before trial, Morrison and the Association settled the state court case.

Thorpe Decl., Ex. 3.  According to that settlement, Morrison entered into a stipulated judgment

for $5,200,000 in favor of the Association and assigned its claims against First Mercury to the

Association.  First Mercury seeks a declaratory judgment that it has no obligation under its three

insurance policies to indemnify Morrison or otherwise satisfy the $5,200,000 judgment.  In

response, the Association and Morrison have filed a counterclaim for breach of contract based on

First Mercury's refusal to defend Morrison in state court or pay the resulting judgment.

## DISCUSSION

First Mercury asserts that the property damage at the Waterside Condominiums alleged in

the state court case falls outside the time period covered by the 2005-06 policy and also falls

within both the Wrap-Up Exclusion in the 2006-07 and 2007-08 policies and the Specific

Operations Exclusion in all three policies.

## I.    Evidentiary Objections

As a preliminary matter, the Association objects to four exhibits submitted in support of

First Mercury's motion based on lack of authentication and inadmissibility under ORS 742.016.

Three of these exhibits contain excerpts from Morrison's applications for renewal of First

Mercury's policies submitted in 2005, 2006, and 2007.  Green Decl., ¶¶ 2-4, Exs. 1-3.  The

fourth exhibit consists of the declarations page for the policy placed by Hayden with Lloyds, London and Exhibit B to Morrison's construction contract with Hayden. *Id*, ¶ 5, Ex. 4.

The Association's objection based on lack of authentication is unfounded. The three applications are authenticated as either signed by Morrison's president, Steven A. Barstaad, or by Swett & Crawford, or both. Swett & Crawford is Morrison's insurance broker. Green Decl., ¶ 2. "An insurance broker is the agent of the insured in negotiating for a policy, and owes a duty of his principal to exercise reasonable skill, care, and diligence in effecting insurance." *Joseph Forest Prods., Inc. v. Pratt*, 278 Or 477, 480, 564 P2d 1027, 1029 (1977), quoting 16 J. APPLEMAN, INSURANCE LAW AND PRACTICE 510-514 (1968). The fourth exhibit contains documents that Cover X Specialty, a surplus lines insurance producer, kept in its underwriting files in the course of its regularly conducted business activities. Green Suppl. Decl., ¶ 4. Thus, authentication is not a barrier to the admissibility of these four exhibits.

However, ORS 742.016(1) renders inadmissible the three exhibits containing excerpts from Morrison's applications for insurance. "ORS 742.016 functions as a parol evidence rule in actions based on or involving insurance policies." *Progressive Ins. v. Nat'l Am. Ins. Co. of Cal.*, 201 Or App 301, 307, 118 P3d 836, 839 (2005), citing *DeJonge v. Mut. of Enumclaw*, 315 Or 237, 242, 843 P2d 914, 917 (1992). In particular, it restricts the admissibility of applications for insurance coverage:

> When the contract is made pursuant to a written application therefor, if the insurer delivers a copy of such application with the policy to the insured, thereupon such application shall become a part of the insurance policy. Any application that is not so delivered to the insured shall not be a part of the insurance policy and the insurer shall be precluded from introducing such application as evidence in any action based upon or involving the policy.

ORS 742.016(1).

The record contains no evidence that First Mercury delivered to Morrison copies of the applications with the policies as required by this statute. Thus, these applications are not "part of the insurance polic[ies]" and cannot be introduced "as evidence in any action based upon or involving the polic[ies]." *Id.*

First Mercury argues that ORS 742.016 does not apply because it offers the applications only as evidence of the existence of Morrison's wrap-up insurance program, and not as evidence of any supplemental policy terms. Without citing supporting authority, First Mercury argues the statute's purpose is to prevent an insurer from adding policy terms that were not fairly disclosed to the insured. However, the language of the statute does not mention the intended use of the application. Instead, it broadly bars the use of the application "as evidence in any action based upon or involving the policy." This is such an "action based upon or involving the policy" for each application.

Oregon courts have recognized certain exceptions to this statute, but the intended use of the application by the insurer is not one of those exceptions. *Progressive*, 201 Or App at 307 n2, 118 P3d at 839, citing *DeJonge*, 315 Or at 242, 843 P2d at 917 (insurer may be estopped to deny the existence of coverage notwithstanding the policy's terms and conditions), *Bennett v. Farmers Ins. Co.*, 332 Or 138, 158, 26 P3d 785, 797 (2001) (applying estoppel when insured has been led to rely on a perceived waiver of a policy provision), and *Collver v. Salem Ins. Agency, Inc.*, 132 Or App 52, 60-61, 887 P2d 836, 842 (1994) (claim for insurance coverage based on an oral agreement which did not include a written application).

According to the Oregon courts, the purpose for requiring "that a copy of the application be *attached* to the issued policy" is to ensure that "the policyholder is provided with everything that the insurer relies on in issuing the policy, *i.e.*, the entire agreement of the parties." *Ives v.*

*INA Life Ins. Co.*, 101 Or App 429, 433, 790 P2d 1206, 1208 (1990) (internal quotation marks and citations omitted).  Morrison arguably understood the application to be part of the policy because its president indorsed on each that "[t]he undersigned, therefore warrants . . . [t]he Supplemental Questionnaire, and the application to which it is appended shall be the basis of any insurance policy that may be issued and will be part of such policy."  Green Decl., Exs. 1-3, p. 8. However, ORS 742.016(1) only allows the application to be admitted as part of the policy *if* the insurer "delivers a copy of such application with the policy."  This language does not create an exception when the application purports to be incorporated into the policy, and the Oregon courts have not interpreted the statute in that way.  Because there is no evidence of delivery, the applications are not part of the policies and, thus, are inadmissible as evidence in this action based upon those policies.

The fourth exhibit contains two documents concerning Morrison's wrap-up insurance program.  *Id*, ¶ 5 & Ex. 4.  ORS 742.016(1) is not a barrier to admissibility because it only implicates evidence contained in the application to the policy at issue in the action.  The declarations page is for Policy No. LSP0312, placed by Hayden with underwriters at Lloyd's, London.  The other document, Exhibit B to the General Contract between Morrison and Hayden, explains the Set-Aside for completed operations.  In contrast to the other three exhibits, neither document has been shown to be part of any renewal application for the policies at issue here. [1] *Id*, Exs. 1-3, p. 1 ("Attached please find a narrative, Acord [*sic*] Application, Questionnaire, Subcontract Agreement and loss runs.").  Thus, these documents are admissible.

///

///

---

[1] Although Morrison stated at oral argument that it believed these documents were submitted as part of its renewal applications, it submitted no evidence to that effect.

II.    **Coverage Under 2005-06 Policy**

The 2005-06 policy provides coverage for property damage to the Waterside
Condominiums that occurred during the policy period from February 1, 2005, through
February 1, 2006.  The state court complaint does not specify when the alleged property damage
occurred or even when construction began and ended.  However, First Mercury contends that all
of the alleged property damage occurred after the 2005-06 policy expired.

The record contains some evidence that construction began on the Waterside
Condominiums about the same time as the 2005-06 policy began coverage because the
construction contract between Morrison and Hayden is dated January 25, 2005.  Green Decl.,
Ex. 4, p. 3.  First Mercury places the initial date of the property damage no earlier than
February 17, 2006, based on the defects alleged in the state court complaint which arise only
from post-slab and concrete construction.  As proof of when the slab and concrete construction
was completed and the alleged defects first occurred, it has submitted a copy of the City of
Portland's inspection and permit summary for the Waterside Condominiums showing that the
inspectors partially approved the concrete on February 17, 2006, and the slab work on March 22,
2007.  Thorpe Decl., Ex. 1.

The Association has submitted other evidence as proof to the contrary.  That evidence is
an invoice produced during discovery in the state court lawsuit from the project file of Time
Frame, Inc., dated December 31, 2005, stating that the "percentage completed to date" was
40.17%.  Guse Decl., Ex. B.  The Association argues that this evidence proves that the allegedly
defective construction was completed within the 2005-06 policy period.

Both pieces of evidence are inconclusive as when the alleged water intrusion and
property damage occurred.  As for First Mercury's evidence, when permits were issued or when

inspections occurred does not necessarily prove when construction was completed. Furthermore, the Association alleged that the property damage was caused in part by improper design and noncompliance with codes and standards which, although unlikely, could have caused damage during the earliest stages of construction. As for Morrison's invoice, the record does not reveal what Time Frame, Inc., did, who was paid for particular work, or the nature of the work completed by December 31, 2005. Because a genuine issue of material fact exists as to when the property damage occurred, First Mercury is not entitled to summary judgment on the 2005-06 policy on this basis.

### III.    **Policy Exclusions**

#### A.    **Insurance Contract Interpretation**

In Oregon, the interpretation of an insurance policy is a question of law. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703, 706 (1992). The initial burden of proving coverage is on the insured, but the insurer bears the burden of proving that a particular claim falls within an exclusion in the policy. *Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or App 485, 509, 156 P3d 105, 119 (2007) (citations omitted).

When analyzing an insurance contract, "[t]he primary and governing rule of construction is to ascertain the intention of the parties." *Hoffman*, 313 Or at 469, 836 P2d at 706. In order to determine the intent of the parties, the court looks to the terms and conditions of the insurance policy itself. ORS 742.016. Under *Hoffman*, the parties' intent is determined in three steps.

"The first step is to examine the text of the policy to determine whether it is ambiguous, that is, whether it is susceptible to more than one plausible interpretation." *Andres v. Am. Standard Ins. Co. of Wis.*, 205 Or App 419, 423, 134 P3d 1061, 1063 (2006), citing *Hoffman*, 313 Or at 469-70, 836 P2d at 706. "The text of the policy includes any definitions of disputed

9 – OPINION AND ORDER

terms included in the policy; we must, in fact, construe the policy in accordance with any such definitions." *Id* (citations omitted). "Only if the policy does not define the terms in dispute do we invoke assumptions about 'ordinary meaning' and other aids to construction." *Id* at 424, 134 P3d at 1063. "The first aid to interpretation is determining whether the term at issue has a *plain* meaning. The meaning of a term is 'plain' — that is, unambiguous — if the term is susceptible to only one plausible interpretation. If so, the parties' intent conclusively is established, and our interpretive inquiry is at an end." *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or 303, 308, 985 P2d 1284, 1287 (1999), citing *Hoffman*, 313 Or at 469-71, 836 P2d at 706-07. If not, the term is ambiguous, and the court proceeds to the second step and examines the disputed terms "in the light of, among other things, the particular context in which the term is used in the policy and the broader context of the policy as a whole." *Hoffman*, 313 Or at 470, 836 P2d at 707.

The parties dispute the standard for analysis under the third step. The Association argues that if an ambiguity remains, the final step is to construe the policy against the drafter. *Id* at 470-71, 836 P2d at 706-07; *see also Andres*, 205 Or App at 424, 134 P3d at 1063. First Mercury disagrees and asserts that when construing an ambiguity in non-standard policy language, the court may consider extrinsic evidence of the parties' intent.

It is well-established in Oregon that extrinsic evidence may be considered to determine the parties' intent in a non-insurance contract. *Yogman v. Parrott*, 325 Or 358, 363, 937 P2d 1019, 1022 (1997). However, as recognized by Judge Mosman, Oregon applies a different rule when interpreting an insurance policy and bars the court from considering extrinsic evidence of the parties' intent. *In re Helicopter Crash Near Weaverville, Cal*., 714 F Supp2d 1098, 1104-08 (D Or 2010) (analyzing Oregon law). Why this distinction is made between insurance and non-insurance contracts is unclear since the analysis in *Hoffman* is designed to determine the parties'

intent.  As aptly noted by the Oregon Court of Appeals, "[t]he Supreme Court has not explained precisely why, if such ambiguity persists, we are required to resort to a maxim of construction and are not instead directed to extrinsic evidence to determine what the parties intended.  That, after all, is the usual analytic sequence in contract interpretation cases."  *Andres*, 205 Or App at 424, 134 P3d at 1063, citing *Yogman*, 325 Or at 361-64, 937 P2d at 1021-22.

Citing several Oregon appellate cases in support, First Mercury argues that the explanation lies in the difference between construing ambiguous language in a non-negotiated standard policy provision and a policy provision that is negotiated and non-standard.  A careful review of the Oregon case law and its application by this court support the conclusion that *Hoffman* does not always exclude extrinsic evidence.

In another case decided the same year as *Hoffman*, the Oregon Supreme Court reasoned that "[t]he parties presented no evidence, such as evidence of their negotiations, about what meaning they actually intended."  *Joseph v. Utah Home Fire Ins. Co.*, 313 Or 323, 328, 835 P2d 885, 887 (1992) (*en banc*).  Without overruling *Joseph*, *Hoffman* did not address the role of extrinsic evidence in its methodology.  Instead it stated that "after all other methods for resolving the dispute over the meaning of particular words fail, *then* the rule of interpretation against the drafter . . . becomes applicable."  *Hoffman*, 313 Or at 470-71, 836 P2d at 706-07.  Interpreting this standard, Judge Coffin concluded that "[i]f, after such analysis, the court determined that the term is ambiguous, the court may then consider extrinsic evidence in interpreting the insurance contract."  *Alkemade v. Quoanta Indem. Co.*, Case No. 6:12-cv-00844-TC, 2013 WL 1500826, at *6 (D Or Jan. 8, 2013), citing *Protection Mut. Ins. Co. v. Mitsubishi Silicon Am. Corp.*, 164 Or App 385, 992 P2d 479 (1999).  More recently Judge Haggerty stated that "strict construction is inappropriate when the ambiguous language at issue in the policy was

supplied by the insured, its agent, or its broker." *Regence Grp. v. TIG Specialty Ins. Co.*, 903 F Supp2d 1152, 1165 (D Or 2012), citing *Travelers Indem. Co. v. United States*, 543 F2d 71, 74 (9th Cir 1976) (an agent of an insured acting independently of the insured chose the disputed language). Although the insured's agent in *Regence* had requested RICO coverage and certain exclusions, the insurer ultimately drafted the language, allowing Judge Haggerty to construe the language against the insurer.

In the majority of cases applying the maxim of construing ambiguous policy language against the drafter, the language at issue was non-negotiated, standard, and provided by the insurer. Thus, the courts construed the language against the insurer. *See, e.g.*, *Tualatin Valley Hous. Partners v. Truck Ins. Exch.*, 208 Or App 155, 160, 144 P3d 991, 993 (2006) ("we will construe the policy against the drafter, in this case, defendant"). However, when faced with construing ambiguous language in a non-standard provision negotiated by the parties, logic dictates that a court should consider whatever evidence of the parties' intent is available. After all, Oregon courts have stated that "the rule of liberal construction in favor of the insured is subordinate to the rule that with insurance contracts, as with other contracts, the primary and governing consideration is to ascertain the intent of the parties." *First Far W. Transp., Inc. v. Carolina Cas. Ins. Co.*, 47 Or App 339, 343, 614 P2d 1187, 1190 (1980), citing *inter alia Waller v. Rocky Mtn. Fire & Cas.*, 272 Or 69, 79, 535 P2d 530, 535 (1975). No Oregon case explicitly bars that approach, and *Hoffman* and its progeny appear to require it. *Hoffman*, 313 Or at 469, 836 P2d at 706 ("primary and governing rule . . . is to ascertain the intention of the parties").

However, allowing extrinsic evidence under this analysis does not assist First Mercury. As discussed below, even if the exclusions at issue are ambiguous, the Wrap-Up Exclusion contains generic language, is the same in all three policies, and appears to be a standard, non-

negotiated provision.  The parties do not argue otherwise.  Thus, no extrinsic evidence would be admissible to aid in its interpretation.  In contrast, the Specific Operations Exclusion appears to be non-standard based on the variation in its language in the three policies.  Even assuming it to be non-standard, First Mercury has submitted no evidence that this exclusion was negotiated between the parties or that Morrison drafted it.  In fact, it has not argued that any extrinsic evidence even exists that would assist the court in determining the parties' intent as to this exclusion.  Thus, whether extrinsic evidence should be considered as to the Specific Operations Exclusion is a moot issue.

Alternatively, First Mercury argues for abandoning a liberal construction to afford coverage because the Association is not a party to the insurance contract, citing *Flexi-Van Leasing, Inc. v. Aetna Cas. & Sur. Co.*, 822 F2d 854, 856 (9th Cir 1987).  A party to the litigation who is not a party to the contract "is not usually entitled to a strict construction in his favor in determining whether the contract was made for his benefit."  *Id*, citing *Travelers Indem. Co.*, 543 F2d at 74.  The Ninth Circuit drew this rule from *Milchem, Inc. v. M.A. Smith Well Serv., Inc.*, 351 F Supp 1307 (ED La 1972).  However, *Milchem* clarifies this exception as follows:  "The general rule that doubtful language contained in an insurance policy is to be construed in favor of the insured and against insurer . . . operates only after [the] insured has been determined and not in deciding whether a certain individual belongs to the insured class described in the policy."  *Id* at 1311.  Since the central issue in *Travelers* was whether a third party was an insured under the policy, the court did not employ the general rule of liberal construction.  *Travelers*, 822 F2d at 856.  The Ninth Circuit has not extended the *Milchem* exception beyond the *Travelers* scenario.

Morrison is the insured under the First Mercury policy, and it is undisputed that the Association is not an intended beneficiary of the policy.  While a finding of coverage will benefit

the Association by helping to satisfy its judgment against Morrison, the issue is whether Morrison is entitled to indemnification.  As the insured, Morrison is still entitled to a liberal construction.  The potential, indirect benefit to the Association does strip Morrison of that entitlement.

**B.    <u>Wrap-up Exclusion</u>**

Both the 2006-07 and 2007-08 policies contain the Wrap-Up Exclusion which reads as follows:

**EXCLUSION – DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM**

\* \* \*

**SCHEDULE**

**Description and Location of Operation(s):**

**Any and all Consolidated Insurance Program (Wrap-Up) locations**

\* \* \*

This insurance does not apply to . . . "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Part;

**(2)** Has limits adequate to cover all claims; or

**(3)** Remains in effect.

Greene Decl., Ex. 6, p. 37; Ex. 7, p. 34.

The policies do not include any definition of a "consolidated (wrap-up) insurance program."  Both parties reference the definition of "WRAP-UP (OCIP)" included in each renewal application.  *Id*, Exs. 1-3, p. 8.  However, as discussed above, these applications are not

part of the policy under ORS 742.016(1), are inadmissible, and may not be used in construing the Wrap-Up Exclusion.

In the absence of a definition provided by the policy, the court must first look to the plain meaning of the phrase "a consolidated (wrap-up) insurance program." That phrase does not appear in a dictionary. To argue that Morrison did not have "a consolidated (wrap-up) insurance program," the Association relies on the plain meaning of the word "insurance." Although Hayden had an insurance policy from Lloyd's, London for ongoing operations, it had no insurance policy for Completed Ops Coverage and instead relied on the Set-Aside.

This argument is premised on defining "insurance" as a policy provided by an insurance company subject to specific terms and strictures. However, "insurance" is more broadly defined in the dictionary as "a device for the elimination or reduction of an economic risk common to all members of a large group and employing a system of equitable contributions out of which losses are paid." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1173 (1981). This definition does not explicitly require the issuance of an insurance policy by an insurance company. In fact, insurance treatises explain that wrap-up insurance programs can take various forms. It can be a "contractor controlled" (CCIP) or "owner controlled" (OCIP) program, and "can include various types of coverage." 3 NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE § 30A.26 (2013).

> It generally covers the owner or developer, the contractors and subcontractors, and potentially others such as architects and engineers. A typical program will include builders risk, general liability, and workers compensation/employers liability insurance. Sometimes, umbrella and professional liability insurance may also be wrapped up into the insurance program

SCOTT M. SEAMAN & JASON R. SCHULZE, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 16:3 (2013).

Because consolidated insurance programs are not uniform, the phrase "consolidated (wrap-up) insurance program" is susceptible to more than one plausible interpretation. This ambiguity is confirmed by the Association's contention that wrap-up insurance programs *require* several characteristics — coverage for subcontractors and a coverage period spanning the statutory of limitations — neither of which are referenced as necessary by the description in the insurance treatises.

Thus, the court must proceed to the second *Hoffman* step of considering the term in the context of the specific exclusion and the broader policy. The exclusion covers "[a]ny and all Consolidated Insurance Program (Wrap-Up) locations" and also provides that the policy:

> does not apply to . . . "property damage" arising out of either your ongoing operations or operations included within the 'products-completed operations hazard' at the location described in the Schedule of this endorsement, *as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.*

Green Decl., Ex. 6, p. 37; Ex. 7, p. 34 (emphasis added).

It does not specify any particular location or construction project with a wrap-up program, but does not in any way eliminate Waterside Condominiums. It is undisputed that Morrison was involved in that project for which Hayden provided both on-going coverage through Lloyd's, London and Completed Ops Coverage through a Set-Aside. Thus, as long as the insurance program provided by Hayden was a consolidated (wrap-up) insurance program, this exclusion unambiguously includes the Waterside Condominiums.

On this issue, the record is conclusive. Through its insurance broker, Morrison admitted that Hayden provided a wrap-up insurance program for the Waterside Condominiums that was to be excluded under the 2007-08 policy. An email dated June 17, 2008, from Anchor Insurance & Surety, Morrison's insurance broker, and sent in the course of an audit states that: "We believed

that the only work the insured had during this term was the work on the Condo project which was covered under wrap up and therefore excluded under the policy."  Green Suppl. Decl., Ex. 1, p. 2.  That "wrap up" is evidenced by the Lloyd's, London ongoing operations policy and Exhibit B to the General Contract that describes the Set-Aside to pay claims arising from completed operations.  Based on this admission, Morrison is in no position to contend that the Waterside Condominiums fall outside the scope of the Wrap-Up Exclusion.

C.   **Specific Operations Exclusion**

The parties present conflicting interpretations of the Specific Operations Exclusion.[2] First Mercury argues the exclusion exempts all construction in Nevada and California, as well as residential construction in all other states.  In contrast, under the Association's interpretation, the exclusion applies only to residential construction in Nevada and California.

1.   **2007-08 Policy**

Since its language is clearer, this court begins with the exclusion in the 2007-08 policy which reads as follows:

**EXCLUSION OF SPECIFIC OPERATIONS**

* * *

<u>EXCLUDED OPERATIONS</u>

Description:
EXCLUDES ALL WORK PERFORMED BY THE INSURED OR THE INSURED'S SUB-CONTRACTORS IN THE STATES OF NEVADA OR CALIFORNIA.

DESCRIPTION

NEW Construction operations performed on any work on, for or involving condominiums, town homes or single-family tract homes.

---

[2]  Due to this court's interpretation of the Wrap-Up Exclusion,  the Specific Operations Exclusion in the 2006-07 and 2007-08 policies is unnecessary.   However, as discussed below, it provides an additional basis to exclude coverage.

> For the purposes of this endorsement NEW Construction operations shall mean:
>
> Design, supervision, project management, construction of, or work performed by you or on your behalf on the original construction of a tract or tract home.
>
> Tract or tract home means any one of a group of similar homes built in the same area, project or sub-division, by the same or different builder.
>
> This insurance does not apply to . . . "property damage" . . . arising out of the operations described above even if other causes contribute to or aggravate the . . . "property damage" . . .
>
> It is the intent of this endorsement to exclude from this insurance all claims, demands, or suits as above described. There shall therefore be no duty or obligation on our part under this insurance to defend, respond to, investigate or indemnify anyone, including but not limited to you, your agents . . . or any third parties for any such claim, demand or suit.

Green Decl., Ex. 7, p. 50.

The structure and language of this exclusion are not ambiguous. The exclusion contains two separate "description" headings. The first "description" expressly "excludes all work performed" in "Nevada or California" ("Nevada/California clause"). Unlike the other two policies discussed below, no symbols tether this Nevada/California clause to any other language in the exclusion. It stands alone as a separately described category of excluded work. Thus, it is unambiguous that the exclusion of "all work performed" in "Nevada or California" does not limit the language in the second "description" heading.

The second "description" heading is arguably ambiguous. The phrase "new construction operations" in the first sentence is defined in the next sentence as "the original construction of a tract home or tract home." It is unclear whether the first sentence describes only "new construction operations performed." If so, then based on the definition of "new construction operations," it applies only to tract homes, and not to condominiums and town homes. But that interpretation renders the rest of the first sentence superfluous concerning "any work on, for or

involving condominiums, town homes or single-family tract homes." The court must assume
that parties to an insurance contract do not create meaningless provisions. *Hoffman*, 313 Or at
472, 836 P2d at 707 (citation omitted). To give meaning to the entire first sentence, "new
construction operations" must define a separate category from "any work on . . . condominiums
[and] town homes." Thus, the only plausible interpretation is that the 2007-08 policy, in addition
to excluding "all work performed" in Nevada or California, also excludes the new construction
of tract homes *and* any work on, for, or involving condominiums, town homes, or single-family
tract homes.

    **2.**    <u>**2006-07 Policy**</u>

       The language of Specific Operations Exclusion in the 2006-07 policy varies slightly from
the 2007-08 policy and reads as follows:

**EXCLUSION OF SPECIFIC OPERATIONS**

\* \* \*

<u>EXCLUDED OPERATIONS</u>

Description:
EXCLUDED OPERATIONS:

Description:
" EXCLUSION – RESIDENTIAL CONSTRUCTION WORK

This insurance does not apply to . . . "property damage" arising out of
"RESIDENTIAL CONSTRUCTION WORK", regardless of whether such
operations are conducted by you or on your behalf or whether the
operations are conducted for yourself or for others.

For the purposes of this endorsement RESIDENTIAL CONSTRUCTION
WORK shall mean:

A.   Design, supervision, project management, construction of, or work
performed by you or on your behalf on the construction of a single family
dwelling, a multi-family dwelling (other than an apartment building),
condominium or town home, or
B.     Design, supervision, project management, construction of, or work
performed by you or on your behalf on the conversion of apartments to
condominiums.

" EXCLUDES ALL WORK PERFORMED BY THE INSURED OR THE INSURED'S SUB-CONTRACTORS IN THE STATES OF NEVADA OR CALIFORNIA.

This insurance does not apply to . . . "property damage" . . . arising out of the operations described above even if other causes contribute to or aggravate the . . . "property damage" . . .

It is the intent of this endorsement to exclude from this insurance all claims, demands, or suits as above described. There shall therefore be no duty or obligation on our part under this insurance to defend, respond to, investigate or indemnify anyone, including but not limited to you, your agents . . . or any third parties for any such claim, demand or suit.

*Id*, Ex. 6, p. 51.

This exclusion also has two "description" headings, but the first one simply repeats the general heading ("Excluded Operations"). It is the second "description" that requires interpretation. The Association argues that the quotation mark preceding the second "description" of "EXCLUSION—RESIDENTIAL CONSTRUCTION WORK" is equivalent to an asterisk and, as an asterisk, signals that it is modified by the subsequent Nevada/California clause that is preceded by the same quote mark. The Association cites the dictionary definition of an asterisk as "used to indicate omission of letters or words or reference to a footnote." Under this definition, the Association argues that interpreting the Nevada/California clause to be a separate exclusion, as in the 2007-08 policy, would render the asterisk meaningless, citing the maxim against surplusage.

That reading presents two problems. First, if the Nevada/California clause limits "residential construction work," as the Association suggests, then the word "residential" and its definition (set forth in subparagraphs A and B) are rendered superfluous. It is possible to give another meaning to the asterisk preceding the Nevada/California clause while still construing the second "description" to contain two categories of work. The asterisk could modify the definition of "residential construction work," such that the Nevada/California clause excludes all work,

commercial and residential, in Nevada or California.  Alternatively, the Nevada/California clause could reasonably be read as an exclusion from the exclusion, such that the policy excludes all "residential construction work" except in Nevada or California.  In any event, it is not reasonable to strip meaning from most of the terms only to give meaning to the asterisk.

Second, construing the exclusion as suggested by the Association would require the court to add a term to the Nevada/California clause.  Although "all work" is not defined, the dictionary definition for "all" is "every member or individual component of: each one of."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 54 (1981).  Considering this plain meaning, "all" in the context of this exemption embodies every form of construction, including but not limited to "residential."  To limit the Nevada/California clause only to "residential construction work" in Nevada or California requires the court to add the word "residential" between "all" and "work."  Thus, the only reasonable interpretation is to exclude all "residential construction work" in all states and "all work" in Nevada or California.

### 3.    2005-06 Policy

The 2005-06 policy contains no Wrap-Up Exclusion.  Therefore, it can only exclude coverage under the Specific Operations Exclusion which reads as follows:

**EXCLUSION OF SPECIFIC OPERATIONS**

* * *

EXCLUDED OPERATIONS

Description:
EXCLUDES SPECIFIED RESIDENTIAL WORK:

EXCLUDED OPERATIONS:

Construction operations performed on [sic] any work on, for or involving condominiums, townhouses or single-family tract homes . . .

> *EXCLUDES ALL WORK PERFORMED BY THE INSURED OR THE INSURED'S SUB-CONTRACTORS IN THE STATES OF NEVADA OR CALIFORNIA.
>
> This insurance does not apply to . . . "property damage" . . . arising out of the operations described above even if other causes contribute to or aggravate the . . . "property damage" . . .
>
> It is the intent of this endorsement to exclude from this insurance all claims, demands, or suits as above described.  There shall therefore be no duty or obligation on our part under this insurance to defend, respond to, investigate or indemnify anyone, including but not limited to you, your agents . . . or any third parties for any such claim, demand or suit.

Green Suppl. Decl., Ex. 2, p. 51.

This language is much less clear than in either of the other two policies.  It has one "description" heading, but three lines that begin with "EXCLUDES" and "EXCLUDED."  Despite its ambiguity, this court finds that there is only one plausible interpretation of this exclusion.

The first line after the "description" clearly excludes "specified residential work."  The question then is what "residential work" is "specified"?  The next line, "EXCLUDED OPERATIONS," is followed by a description of those operations, namely "construction operations performed on[3] any work on, for or involving condominiums, townhouses or single-tract tract homes."  All of those listed building types are residential in nature.  Therefore, the "specified residential work" unambiguously means "construction operations performed on any work on, for or involving condominiums, townhouses or single-family tract homes."

The ambiguity arises from the pesky Nevada/California clause.  In this policy it is preceded by an asterisk, but it is impossible to ascertain what that asterisk is intended to modify.  No other clause is preceded by a corresponding asterisk.  Thus, it does not act as a signal to

---

[3] It appears that "on" is a typographical error and should be "or" in order to make the sentence grammatically correct.  Oregon courts use rules of grammar to discern legislative intent in the statutory context.  *See Norris v. Bd. of Parole & Post-Prison Supervision*, 331 Or 194, 206-207, 13 P3d 104, 110-11 (2000), *abrogated on other grounds by Severy v. Bd. of Parole & Post-Prison Supervision*, 349 Or 461, 245 P3d 119 (2010).

modify anything other than the entire Specific Operations Exclusion.  As explained above, construing the asterisk to limit the entire Specific Operations Exclusion only to Nevada or California would render most of the other terms meaningless.  If the reference to "all work" in "Nevada or California" was intended to modify "specified residential work," then it would have to say "some work," not "all work."  Only one reading survives to give every term meaning.  Thus, the Specified Operations Exclusion in the 2005-06 policy excludes all residential construction performed by Morrison, not just residential construction in Nevada and California.

## **ORDER**

For the reasons stated above, First Mercury's Motion for Summary Judgment (docket #36) is GRANTED.

DATED December 5, 2013.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge